**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **25-cr-043 (TNM)** |
| | : | |
| **KALYNN FIELDS** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

For more than 30 years, Kalynn Fields led a law-abiding, upstanding life. She grew up in Iowa, graduated from high school and then college, maintained employment, and worked hard to become an officer with the Metropolitan Police Department (MPD). She served the community as a police officer for seven years. The stress of working as a Seventh District patrol officer affected her more than she recognized at the time, but she was proud to serve. After working as a police officer for approximately four years, in September 2021, a friend told Ms. Fields about the availability of loans related the COVID-19 pandemic. The friend offered to apply for a loan for Ms. Fields. With little thought, she agreed to have the loan submitted on her behalf. She received $20,000, and later received $15,000 for a second request. Although she wanted to begin a trucking business, she was not running any business and knew she had no right to this money. Making false statements to get these loans was the greatest mistake of her life and has had significant consequences. When she received a subpoena related to the government's investigation in late 2024, she knew she needed to acknowledge her unlawful conduct and accept the consequences. Once she obtained counsel, she quickly informed the government that she would enter a guilty plea, and she resigned from her position at MPD. On March 6, 2025, she entered a guilty plea to one count of wire fraud, in violation of 18 U.S.C. § 1343. Since entering

her guilty plea, she has struggled to obtain new employment and support herself, but she used her savings to repay $4,000 of the ill-gotten loans, *see* Exhibit 1, and is working to repay the remainder as soon as possible.

As set forth in the Presentence Investigation Report ("PSR"), ECF 14, the recommended sentencing range under the United States Sentencing Guidelines is 0 to 6 months of incarceration. PSR ¶ 98. The "zero-point" offender provision of the Guidelines further supports a sentence that does not include a term of imprisonment. Ms. Fields has experienced punishing consequences of her crime through the loss of her job and a felony conviction. As the attached letters from Ms. Fields and her family and friends confirm, the offense conduct was inconsistent with the character she has exhibited apart from this conduct and she is deeply remorseful. *See* PSR ¶ 44; Exhibits 2-21. A review of all the sentencing factors under 18 U.S.C. § 3553(a) demonstrates that imprisonment would cause an unwarranted disparity and is not necessary to serve the purposes of sentencing. Those purposes would be appropriately served through the imposition of a term of probation.

## <u>Argument</u>

When imposing a sentence, the Court must consider several factors, including the Guidelines; the nature and circumstances of the offense; the history and characteristics of the defendant; the need to avoid unwarranted disparities; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct; and the kinds of sentences available. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). These factors and the unique circumstances of this case demonstrate that any term of incarceration would be greater than

necessary to serve the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]" (emphasis added)); *see also* U.S.S.G. § 5C1.1., Appl. Note 4 (Nov. 1, 2023) (citing 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .")).

## I. The United States Sentencing Guidelines

The Guidelines strongly support a sentence that does not include a term of incarceration. First, the recommended sentencing range is a term of zero to six months—the lowest possible range under the Guidelines. Moreover, the Sentencing Commission has found that sentences that do not include a term of imprisonment are generally appropriate for first time, zero-point offenders, like Ms. Fields, who are convicted of non-violent offenses that are not otherwise serious. *See* U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and revisions to § 5C1.1 (Imposition of a Term of Imprisonment). The Commission promulgated the Zero-Point Offender provision in recognition of the low recidivism rates of first-time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 (citing 28 U.S.C. § 994 (j)). The Commission amended § 5C1.1 to ensure implementation of 28 U.S.C. § 994(j). *Id.* at 80.

As set forth in the PSR, Ms. Fields qualifies as a "Zero-Point Offender" and her offense level is reduced accordingly. PSR ¶ 53. Ms. Fields's status as a Zero-Point Offender also

supports a sentence that does not include a term of incarceration because she is a first-time

offender convicted of a non-violent offense that is not "otherwise serious." *See* 28 U.S.C. § 994

(j); U.S.S.G. § 5C1.1.

Through the exclusions set forth in § 4C1.1, the Commission has identified crimes that

are violent or otherwise serious and not likely to fall under the directive of § 994 (j). *See*

4C1.1(a)(2)-(10) (excluding from application of zero-point offender provision all offenses that

involve terrorism, violence or threats of violence, death or serious bodily injury, sex offenses,

substantial financial hardship to victims, dangerous weapons, violations of individual rights, hate

crimes, vulnerable victims, violations of human rights, aggravated role adjustments, or engaging

in a continuing criminal enterprise). Ms. Fields's offense is not "otherwise serious" under this

definition. Thus, while most federal offenses could be considered "serious" depending on the

circumstances, Ms. Fields's offense does not fall into that category for purposes of § 994(j).

As the commentary to § 5C1.1, regarding "Imposition of a Term of Imprisonment,"

provides:

> (A) **Zero-Point Offenders in Zones A and B of the Sentencing
> Table.**—If the defendant received an adjustment under § 4C1.1
> (Adjustment for Certain Zero-Point Offenders) and the defendant's
> applicable guideline range is in Zone A or B of the Sentencing
> Table, a sentence other than a sentence of imprisonment, in
> accordance with subsection (b) or (c)(3), *is generally appropriate*.
> See 28 U.S.C. § 994(j).

U.S.S.G. § 5C1.1., Appl. Note 4 (emphasis added).

## II.  The Nature and Circumstances of the Offense

Ms. Fields made false statements to wrongfully obtain money, and as she explains in her

letter, she knows that there is no excuse for doing so. *See* Exhibit 2. The offense conduct is at

4

odds with the values she was raised with and the character she has displayed throughout her life, as described in the many letters submitted from friends and family, who continue to support her despite this offense based on the person she has otherwise proven herself to be. *See* Exhibits 3-21. As a close cousin wrote, this conduct "flies in the face" of who she is known to be. *See* Exhibit 6. As a childhood friend explains, and is echoed by many others, she is known "to be a person of integrity, kindness, and generosity," *See* Exhibit 9. The offense was an aberration that she deeply regrets, not only because of the consequences, but because her conduct violated her own moral compass. She was ashamed and embarrassed to have to admit her conduct to her parents, family, and friends, but she has done so to take full responsibility and demonstrate her desire to be fully accountable for her conduct. *See* Exhibit 15. She is determined to regain their respect by living the remainder of her life "based on honesty, integrity, and accountability." *See* Exhibit 2.

### III. History and Characteristics of Ms. Fields

Like the other sentencing factors under 18 U.S.C. § 3553(e), Ms. Fields's history and characteristics support a sentence that does not include a term of incarceration. She is 34 years old, has never before been arrested for or convicted of a criminal offense, and has a long history of education, employment, and service to the community. Apart from the offense conduct at issue here, she has proven herself to be dependable, loyal, compassionate, deeply empathetic, and a person who strives to learn from her mistakes and improve. *See* Exhibits 3, 5, and 10.

Ms. Fields was born in Des Moines, Iowa, and grew up there. Her father died in a car accident when she was just two years old. When she was nine years old, her mother remarried, and her step-father raised her as his own. She grew up in a spiritual and loving family, and until

committing the instant offense lived by the values her parents taught her—honesty, integrity, kindness and generosity. *See* Exhibit 3-21. Growing up, she was active in sports, including basketball and track and field, and she participated in a dance company, a church youth group ministry, and church choir. She graduated from high school in 2009, and enrolled at Graceland University, which is located not far from her home in Iowa. After a year, she decided to transfer to a bigger university farther from home. In 2010, she moved to Baltimore, Maryland to attend Morgan State University.

While attending Morgan State, she obtained a job as a security officer at a casino to help support herself, and in October 2014, she began working for Enterprise Rent-A-Car as a manger trainee. After graduating from Morgan State in December 2015 with a bachelor's degree, she obtained a job as an outreach and enrollment coordinator for the Center for Urban Families. She worked there until November 2017 when she was laid off due to budget cuts.

She enjoyed working as an outreach coordinator and wanted to continue to serve the community, so she applied for a position with the District of Columbia Metropolitan Police Department (MPD). She was hired in December 2017 and began training at the police academy on December 26, 2017. She completed the academy training in July 2018. Her parents and friends attended her graduation, and it was one of the best and proudest days of her life. She looked forward to a long career as a police officer. The fall from that day to the day she told her parents that she committed the instant offense and had to resign from her position as a police officer was dramatic and impactful—telling her parents was one of the most difficult things she has ever had to do. She is deeply ashamed of her conduct and the harm it has caused her family.

After graduating from the police academy, she began working as a patrol officer in the

Seventh District. She took her work seriously and served with the same compassion and empathy she exhibited throughout her life. Her friend, Anthony Davis, recounted one example of that compassion:

> One moment that stands out was at a local convenience store in Washington, D.C., when we saw a young teen attempting to shoplift. Instead of looking away or calling security, Kalynn approached calmly and paid for the items herself. She didn't make a show of it—she simply wanted to steer the boy away from making a harmful choice. That's who Kalynn is: someone who instinctively steps in to help others, even strangers.

Exhibit 4.

The work, however, was stressful, and she struggled to adjust to the faster pace of life in Washington, D.C., which she found dramatically different than her quiet life in Des Moines. Events she witnessed while working as a Seventh District patrol officer were horrifying. She saw a baby who was smothered in its sleep, responded to an apartment where a baby had been left on a radiator to burn, assisted shooting victims and victims of other violent crimes, and witnessed addiction and despair. Like many of her colleagues, to cope with the events she witnessed while working, when off-duty she began drinking excessively. She also started gambling and spending more money than she had—looking for any distraction from the violence and despair around her. At several points, she sought therapy to help her cope. She first sought therapy in the summer of 2020 after witnessing a man shoot and kill another man in a grocery store in Baltimore while off-duty—she attempted to intervene but was unarmed and could only help move a bystander out of the way as the shots were fired. After this event, she began to realize that this and other traumas were negatively impacting her. She sensed, however, that her colleagues saw the need for therapy as a weakness, and she wanted to succeed as an officer, so she did not consistently seek

7

help. Looking back, she believes that the stress of police work in a very high crime area and her desire to keep up with those around her caused her to lose her own identity and values.

During the pandemic, her financial problems increased because overtime opportunities were more limited and her income was reduced. In April 2021, as she was struggling financially, a friend told her about the Paycheck Protection Program (PPP) loans. The friend suggested that she could get a loan to start a trucking business. Her brother operates a trucking business in Des Moines, and Ms. Fields thought she could do the same here to supplement her income. Knowing that she was not entitled to a loan because she did not yet have a business, she had her friend apply for a loan on her behalf and received $20,000 based on false statements in the application. She originally intended to use the money to start her own trucking business. That, of course, was not a legitimate or authorized purpose for the loan, and moreover, she had no experience in starting such a business and no detailed plan for doing so. In April 2021, she opened a bank account to receive the loan,[1] and in June 2021, she registered Wheels Enterprise as a trade name and received a tax identification number for this business name.[2] With the loan proceeds, she bought a computer and printer to get started, but then did nothing else toward starting the business. Instead, she used the loan proceeds to pay her bills and for personal items. In September 2021, she filed paperwork to have the loan forgiven. Later that year, she met a man through Instagram who was submitting applications under the Economic Injury Disaster Loan (EIDL) program, and she authorized him to submit another application on her behalf. He did so

---

[1] The Statement of Offence, ECF 5 at ¶ 16, mistakenly states this date as April 13, 2020 instead of April 13, 2021, and that error is repeated in the PSR at ¶ 28.

[2] As noted in the Statement of Offence, ECF 5 at ¶ 13, Ms. Fields also incorporated this business name the following year on May 2, 2022.

on September 10, 2021, and she received an additional $15,000, which she also used to pay her bills and for personal items. This man later filed loan forgiveness paperwork on her behalf.

Even before investigators began questioning her about the loans, in early 2023, Ms. Fields knew she was losing her way and needed a change. She thought she might be able to transfer into cybersecurity and enrolled in a cybersecurity certification course. She earned a certification in July 2023, and in August 2023, she began working part-time doing cybersecurity information technology work at Omni Consulting Services as a Security Control Assessor to supplement her MPD income.

In late 2024, however, her false loan applications caught up to her. Investigators approached her about the loans on November 21, 2024. She was scared and did not immediately admit her conduct. The investigators served her with a subpoena and advised her to seek counsel. The following day, she applied for counsel. Undersigned counsel first met with Ms. Fields on December 16, 2024, and Ms. Fields immediately indicated her desire to accept responsibility for her conduct. Counsel began negotiating the details of the plea agreement, and after seven years of service, on January 14, 2025, in anticipation of her guilty plea, Ms. Fields resigned from her position at MPD.

Since resigning from the police force, and beginning before entering her guilty plea on March 6, 2025, Ms. Fields has been trying to rebuild her life. In January 2025, she enrolled in a Commercial Driver's License course at Baltimore Community College. She began classes in February 2025 and completed coursework in May 2025. She is scheduled to take the final road test on June 24, 2025. After obtaining the license, she hopes to obtain a job as a truck driver. In the meantime, she has been working with a Baltimore Community College employment

counselor to apply for positions, and she is waiting on several interviews. She also has attended several job fairs and applied for many other jobs, including positions at Walmart and Target. Unfortunately, she has not yet secured full-time work, but she has been doing deliveries for Amazon Flex as she continues her job search.

Ms. Fields is committed to repaying the $35,000 that she falsely obtained. She had hoped to repay the full amount prior to appearing before the Court for sentencing, but doing so was not possible without employment. As set out in the PSR, she has a small savings account which she is using to support herself while she looks for full-time work. *See* PSR ¶ 88. Although she is struggling financially, she, through counsel, notified the government that she could use a large portion of her savings to make a $4,000 payment to toward restitution. As required, the government subsequently filed a motion for an order directing the clerk's office to accept a payment, and the Court signed the order on June 10, 2025. The following day, Ms. Fields made the $4,000 payment. *See* Exhibit 1. She intends to repay the remainder as quickly as possible.

## V. Unwarranted Disparities

When determining an appropriate sentence, the Court must avoid unwarranted disparities by considering the Guidelines and sentences imposed in similar cases. As noted above, the Guidelines support a sentence of probation. A review of similar cases also supports a sentence of probation.

The most analogous case in this district is *United States v. Owen Grigsby*, 24-cr-186 (RDM). Like Ms. Fields, Mr. Grigsby was a MPD officer who committed wire fraud to obtain pandemic-related loans (an EIDL in the amount of $41,666 and a PPP loan in the amount of $53,600). Because the value of the loans obtained by Mr. Grigsby was nearly three times the

value of the loans obtained by Ms. Fields, his Guidelines sentencing range was higher, a range of 6 to 12 months, and did not include a recommendation of probation. Nonetheless, the court sentenced Mr. Grigsby to a two-year term of probation with eight months of home detention. The court also sentenced the codefendant, who was not an MPD officer but helped Mr. Grigsby secure the loans, to a two-year term of supervised release with eight months of home detention. Ms. Fields, like Mr. Grigsby, committed the offense based on financial pressure as a result of reduced income from her job due to the pandemic, lost her job as a result of the offense, deeply remorseful, and repaid the portion of the loan that she could prior to sentencing. Because the cases are remarkably similar, like Mr. Grigsby, she too should be sentenced to a term of probation.[3]

At least one other defendant in this jurisdiction, who was responsible for a significantly higher loss amount and had a Guideline range of 21 to 27 months, was also sentenced to probation. *See United States v. Patrick Strauss*, 24-cr-374 (RC), ECF 28 (Feb. 5, 2025) (defendant responsible for loss in excess of $300,000 related to PPP loan fraud sentenced to 48-month term of probation with six months home detention and 26 weekends of intermittent confinement).[4]

---

[3] A MPD officer was also charged with fraud related to PPP loans, but that officer exercised his right to trial and the matter is pending. *See United States v. Roberto Adams*, 21-cr-625 (APM). Although a recent Washington Post article reported that at least two dozen police officers were under investigation for PPP loan fraud, *see* Wash. Post, *Dozens of D.C. Police Officers targed in sweeping pandemic fraud probe* (Apr. 5, 2025), https://www.washingtonpost.com/dc-md-va/2025/04/05/dc-police-ppp-loan-investigation-fraud/, government counsel indicated that she is unaware of any other prosecutions involving MPD officers.

[4] Counsel is aware of other defendants in this jurisdiction who were sentenced to terms of incarceration for PPP loan fraud, but those defendants had significantly higher Guideline ranges and other aggravating circumstances. *See United States v. Craven Casper*, 20-cr-102 (APM),

Although some defendants charged with PPP loan fraud related to high loss amounts in this and other jurisdictions, with significantly higher Guideline ranges, have been sentenced to incarceration, many defendants in other jurisdictions—like Mr. Grigsby and Mr. Strauss— including a former FBI employee, who were charged with PPP loan fraud related to loss values closer to the loss amount here, received sentences that did not include a term of incarceration. *See*, *e.g.*, *United States v. Rakita Davis*, 1:24-cr-00056-HAB-SLC, ECF 30, 34 (D. Ind. May 21, 2025) (former IRS employee sentenced to 24-month term of probation for submitting two false PPP loan applications and ordered to repay $55,213.61); *United States v. Christopher James Phillips*, 5:24-cr-00007-DAE, ECF 44 (W.D.Tx. Feb. 11, 2025) (former FBI employee sentenced to five-year term of probation for fraudulently obtaining $39,771.57 PPP loan); *United States v. Steven Ball-Vaughn*, 2:22-cr-189-JHS, ECF 59, 67 (E.D. Pa. October 9, 2024) (defendant sentenced to time served—only the hours served between arrest and initial appearance on the same date—and a three-year term of supervised release for false statements in three PPP applications and two EIDL applications and fraudulently obtaining $62,283); *United States v. Cadece Lapread*, 2:23-cr-730-EP, ECF 81 (D.N.J. Mar. 5, 2024) (defendant sentenced to three-year term of probation for submitting false PPP loan application and obtaining $20,833); *United States v. Andre K. Johnson*, 1:23-cr-10021-JES-JEH, ECF 16, 18 (C.D. Ill. Oct. 31, 2023)

---

ECF 47 (D.D.C. Feb. 5, 2021) (defendant with Guideline range of 33 to 41 months, who committed PPP loan fraud while on release for unrelated fraud charge, sentenced to 36 months of incarceration for the two unrelated schemes); *United States v. Wendy Villatoro*, 24-cr-446 (CJN), ECF 18, 27 (D.D.C. Mar. 12, 2025) (defendant responsible for attempting to obtain $5.5 million in PPP and EIDL loans, with a Guideline range of 33 to 41 months, sentenced to 15 months of incarceration and ordered to pay $844,415.24 in restitution); *United States v. Zhong Chen*, 24-cr-050 (CRC), ECF 18, 20 (D.D.C. Jul. 2, 2024) (defendant, who had prior conviction for assault with a deadly weapon and attempted kidnapping, responsible for $348,7000 in EIDL loan fraud with a Guidelines range of 24 to 30 months, sentenced to 18 months of incarceration).

(defendant with prior conviction for weapon offense sentenced to three-year term of probation for submitting false application and obtaining $20,586.05 PPP loans).

Judiciary Sentencing Information (JSIN) data for defendants sentenced during the last five fiscal years (FY2020 through FY 2024) also supports a sentence that does not include a term of incarceration. As set forth in the PSR at ¶ 123, of the 205 defendants whose primary guideline was § 2B1.1, with a final offense level of 7 and criminal history category of I, only 76 received any term of imprisonment. In other words, 62 percent (129 of 205) of similarly situated defendants received sentences that did not include a term of incarceration. Ms. Fields's history and characteristics and genuine remorse support imposing a sentence consistent with the sentences imposed for the majority of similarly situated defendants—including the only other similarly situated former MPD officer (Mr. Grigsby), but who also had a higher Guidelines range.

## VI. The Purposes of Sentencing and Kinds of Sentences Available

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017). A sentence that does not include a term of incarceration, in addition to the collateral consequences Ms. Fields has experienced, will satisfy the basic aims of sentencing. As a result of her conduct and the charge in this case, Ms. Fields lost her job and has a felony conviction that will limit her job opportunities for the remainder of her life. She experienced the shame and humiliation of admitting her conduct to her parents and other family members and friends. These consequences

had and will continue to have a lasting impact.

When a defendant suffers consequence of her criminal conduct—apart from the sentence imposed through the criminal court process—the sentencing court can take this collateral punishment into account in fashioning a sentence. The loss of Ms. Fields's position as a police officer is such a consequence. *See*, *e.g., United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting downward variance in part because defendant lost good public sector job as a result of his conviction); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as a result of his EPA-related charges).

Additional incarceration is not necessary to reflect the seriousness of the offense or promote respect for the law. By structuring a sentence that does not involve incarceration consistent with 28 U.S.C. § 994(j) and U.S.S.G. § 5C1.1, the Court can serve the purposes of sentencing without imposing punishment that is greater than necessary.

Finally, the Court should consider the kinds of sentences available. While incarceration is an option, that option would be unnecessarily harsh under the circumstances of this case, particularly given the vulnerability of former police officers who are incarcerated. It is no secret that Ms. Fields is a former police officer and anyone could easily enter (or have someone enter) her name into an internet search and learn this information. The government's press release issued on March 6, 2025, following Ms. Fields's guilty plea, is the first result when her name is searched and identifies her as a former MPD Officer. Many news stories followed and also appear when her name is searched. This information would make her particularly vulnerable if incarcerated and such a sentence unnecessarily harsh.

14

## Conclusion

The instant offense occurred four years ago, and Ms. Fields committed no criminal conduct before or since the offense. She has accepted responsibility, abided by the conditions of release, and demonstrated both sincere remorse and a commitment to living a law-abiding life. The circumstances of this case and other sentencing factors support a sentence of a term of probation. These factors include: (1) Congress's directive that first-time offenders convicted of non-violent offenses that are not otherwise serious should receive a sentence that does not include a term of imprisonment; (2) the Guidelines; (3) Ms. Fields's pretrial compliance; (4) Ms. Fields's lack of prior or subsequent criminal history; (5) her history of employment and service to the community; (6) the collateral consequence—additional punishment—of the loss of her career as a police officer; and (7) her character apart from this offense, genuine remorse and desire to change as evidenced by the many letters of support submitted on her behalf.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

15